IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CONTICO TRADING CO., S.A., | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | **IN ADMIRALTY** |
| | ) | |
| TRANSPORTACIÓN MARÍTIMA | ) | |
| MEXICANA, S.A. DE C.V., | ) | |
| | ) | |
| *Defendant,* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CELANESE CORPORATION, CELANESE | ) | |
| INTERNATIONAL CORPORATION, LBC | ) | |
| HOUSTON L.P. (FORMERLY LBC | ) | |
| PETROUNITED), THE DOW CHEMICAL | ) | |
| COMPANY, ED&F MAN LIQUID | ) | |
| PRODUCTS LLC, EXPEDITORS | ) | |
| INTERNATIONAL OCEAN, INC. AND | ) | |
| INCHCAPE SHIPPING SERVICES, INC. | ) | |

*Garnishees.*

### VERIFIED COMPLAINT AND REQUEST FOR ISSUE OF
### WRITS OF MARITIME ATTACHMENT AND GARNISHMENT

Plaintiff Contico Trading Co, SA ("Contico") brings this action against defendant

Transportación Marítima Mexicana, S.A. de C.V. ("TMM"), *quasi in rem*, pursuant to

Supplemental Admiralty and Maritime Rule B for issue of writs of maritime attachment and

garnishment, and states as follows:

### Jurisdiction and Venue

1.     This is a case of admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333

and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of

Civil Procedure.

2.      Venue is proper in this District because the Garnishees are located and can be found in this District.   Defendants cannot be found in this District within the meaning of Supplemental Rule B.

### The Parties

3.      Contico is a Panama corporation.

4.      TMM is a Mexico corporation.

5.      The Garnishees named herein are entities registered to do business, and with offices located, in this District.   On information and belief, each Garnishee holds property in which TMM has an interest.

### Facts

6.      TMM ordered from Contico, fuel ("bunkers") for ocean vessels which TMM owned and/or chartered, pursuant to Contico's sales terms and conditions, **Exhibit A hereto**. Contico's sales terms and conditions include the following:

10.10. Seller [Contico] may apply payments received from or on behalf of Buyer, notwithstanding any specific request to the contrary, to obligations of Buyer at the sole discretion of Seller in any order, including but not limited to the following in diminution or extinction of:

10.10.1. Accrued financial and other charges in respect of transactions for which the principal sum has been previously paid;

10.10.2. Accrued financial and other charges arising from all other transactions;

10.10.3. Any principal sum or sums due and outstanding commencing with the oldest and proceeding chronologically thereafter to the most recent;

10.10.4. Any principal sum which Seller knows or reasonably expects will fall due at a future date;

10.10.5. Any amount which is not subject to a maritime lien or other form of security available to Seller.

10.11. Any attempt by Buyer to assign payments to certain invoices or amounts shall be null and void.

\* \* \* \*

28.9. Buyer shall, in connection with any action by Seller to recover from Buyer and/or the Vessel any amount of the Price or other amount owed to Seller, and/or any action by Seller to enforce this Contract, pay to Seller all of Seller's actual attorneys (including paraprofessional) fees, costs, and expenses.

7.      Contico's further terms of sale were that TMM was to pay Contico within seven (7) days of providing the fuel to TMM's vessels, and that late payments would bear interest at 2% per month.  An example of Contico's confirmation of sale with these terms, is **Exhibit B hereto**.

8.      TMM, failed to pay Contico, and as a result, Contico was forced to retain legal counsel to make demand on TMM.  Although TMM made payments to Contico, all of such payments were considerably late, accruing contractual interest.  Contico applied such payments first to accrued interest, then to principal, as Contico's sales terms provide, as detailed in **Exhibit C hereto**.  After such application, TMM continues to owe significant sums to Contico, and attorneys fees and costs, as set out in the demand for judgment, below.

**9.**      Despite demand, TMM has failed to pay Contico the amounts which TMM continues to owe Contico.

### Count I – Breach of Maritime Contract

10.      Contico incorporates the above paragraphs as if fully set forth herein.

11.      TMM has breached its maritime contract with Contico to pay for marine fuel as agreed, as set out more fully above.

12.      Despite repeated demand, Contico remains unpaid by TMM for amounts due in breach of maritime contract.

01:23325083.1

13.     Contico demands judgment against TMM as set forth more fully below.

### Count II – Maritime Attachment and Garnishment (Rule B)

14.     Contico incorporates the above paragraphs as if fully set forth herein.

15.     Contico seeks issue of process of maritime attachment pursuant to Supplemental Rule B, for its damages including accruing interest, attorneys fees and costs.

16.     No security for Contico's claims has been posted by TMM or anyone acting on its behalf to date.

17.     TMM cannot be found within this district within the meaning of Rule B, but is believed to have, or will have during the pendency of this action, property and/or assets in this jurisdiction – namely, accounts owing to it from Garnishees in this District.

WHEREFORE, Contico prays:

A.     That process in due form of law issue against TMM, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.     That since TMM cannot be found within this District pursuant to Rule B, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all of TMM's tangible or intangible property or any other funds held by any garnishee, which are due and owing to TMM, up to the amount of at least $120,749.97 ($ 86,333.93 principal, contractual interest to date of $ 4,416.04, and estimated attorneys fees and costs of $30,000), plus daily contractual interest of $54.51 to the date of garnishment to secure Contico's claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Rule B, answer the matters alleged in the Verified Complaint;

C.     That since it appears that the U.S. Marshal's Service lacks sufficient staff to effect service of process of Maritime Attachment and Garnishment promptly or economically, and that since appointing a person over 18 years of age and who is not a party to this action will result in substantial economies in time and expense, such a person be appointed pursuant to Fed. R. Civ. P. 4(c) to serve process of Maritime Attachment and Garnishment in this action; and

D.     That Contico may have such other, further and different relief as may be just and proper.

YOUNG CONAWAY STARGATT
& TAYLOR LLP

_____
Timothy Jay Houseal (Del. Bar ID No. 2880)
Jennifer M. Kinkus (Del. Bar ID No. 4289)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6682
thouseal@ycst.com

Dated: June 15, 2018                *Attorneys for Contico Trading Company, S.A.*

01:23325083.1

# EXHIBIT A

# CONTICO TRADING CO, SA
## General Terms and Conditions of Sale

These General Terms and Conditions of Sale ("GTCs") are the terms and conditions under which Contico Trading Co, SA and any affiliated companies ("Seller") agree with Buyer to provide Buyer and the Vessel with Marine Fuel (the "Contract"). These GTCs shall apply to all deliveries contracted, unless Seller expressly confirms otherwise in the Confirmation. Each delivery shall constitute a separate contract.

## 1.   TERM

This Contract shall commence as of the date of Seller's e-mail confirmation of stem and remain in effect until all obligations herein are completed, unless terminated sooner by either Party as provided herein.

## 2.   DEFINITIONS

Throughout this Contract, except where the context otherwise requires, the following definitions shall be applied:

2.1.   "Affiliate" means any company of which a party or its parent owns, directly or indirectly, 50% or more of the shares entitled to vote at an election of directors.

2.2.   "Banking Day" shall mean a day on which banks are open in the places of business of Seller and Buyer and, where a remittance is in United States dollars, in New York or, if other than United States dollars, in the country of the price currency.

2.3.   "BDN" means Bunker Delivery Note or Bunker Delivery Receipt.

2.4.   "Bunker Tanker" means bunker barge or tanker or tank truck supplying Marine Fuel to the Vessel.

2.5.   "Buyer" means the party contracting to purchase, take delivery and pay for the Marine Fuel and includes the Vessel; the Vessel's owners, managers, and operators; and any Trader, Intermediate Buyer, or other entity collectively or individually agreeing to purchase, take delivery, and/or pay for the Marine Fuel.

2.6.   "Confirmation" means Seller's written confirmation.

2.7.   "Contract" means this contract of sale and delivery of Marine Fuel between Seller and Buyer and the Vessel, all subject to the GTCs.

2.8.   "Day/Days" means a calendar day(s), unless otherwise stated.

2.9.   "Delivery" means Seller's provision of Marine Fuel to Buyer and/or the Vessel.

2.10.  "Due Date" means the date specified in the Confirmation for payment of the Price and any and all other fees, costs, charges and like items.

2.11.  "Intermediate Buyer" means any Buyer selling the Marine Fuel to any entity other than the Ultimate Purchaser.

2.12.  "Marine Fuel" means marine fuels, derived from crude oil, delivered or to be delivered to the Vessel as stated in the Confirmation.

EXHIBIT A

2.13.   "Parties" means Seller and Buyer collectively.

2.14.   "Party" means Seller or Buyer.

2.15.   "Physical Supplier" means the entity physically providing the Marine Fuel to the Vessel together with that entity's servants, agents, successors, subcontractors and assigns. The Physical Supplier may be Seller or any other entity.

2.16.   "Place of Supply" means the port or other readily identifiable geographical area specified in the Confirmation wherein or adjacent to which is the Point of Delivery.

2.17.   "Point of Delivery" means the precise place at which provision to the Vessel is to be effected as provided in the Confirmation or as thereafter confirmed, advised or revised by Seller or Physical Supplier being a berth, mooring, anchorage or other point within, adjacent to or associated with the Place of Supply.

2.18.   "Price" means the price as set forth in the Confirmation and subject to the GTCs.

2.19.   "Risk" means responsibility for and prevention and avoidance of loss, damage, liability, charges, fines, taxes and/or assessments.

2.20.   "Seller" means the party contracting to sell and deliver the Marine Fuel.

2.21.   "Trader" means any entity, other than Seller, which sells the Marine Fuel to any Buyer.

2.22.   "Ultimate Purchaser" means the entity, including any Buyer, operating, managing and/or controlling the Vessel which receives the Marine Fuel.

2.23.   "Vessel" means the vessel nominated by Buyer to receive the Marine Fuel.

Unless the context otherwise requires, all references in the GTCs to the singular shall be deemed to include the plural and vice versa.

The use of headings and explanatory notes is for convenience and elucidation only. They are not part of the GTCs.

### 3.   BROKERS / AGENTS

3.1.   Unless the party with whom Seller is corresponding specifically declares to Seller prior to Seller's issuing the Confirmation that the party with whom Seller is corresponding is not Buyer and at the same time provides to Seller the full name and address of Buyer, then the party with whom Seller is corresponding shall be deemed to be Buyer.

3.2.   Without prejudice to the provisions of Clause 3.1, in the event that the party with whom Seller is corresponding is an agent of Buyer then the party with whom Seller is corresponding shall be jointly and severally liable with Buyer to perform Buyer's obligations under the Contract, notwithstanding that the party with whom Seller is corresponding purports to be as a mere agent.

### 4.   QUALITY / GRADES

4.1.   Buyer shall have the sole responsibility for the nomination of the grades of Marine Fuel fit for use by the Vessel.

4.2.   Seller may discharge its obligation to deliver the Marine Fuel as specified in the Confirmation by supplying in substitution thereof Marine Fuel of a different grade and/or

brand name, provided that in the sole opinion of Seller such substitute Marine Fuel is of an equivalent or superior specification to that specified in the Confirmation.

## 5.  QUANTITY / MEASUREMENTS

5.1.  Subject to the other terms of the Contract, the quantities of Marine Fuel delivered shall be determined from the official gauge or manual sounding or meter of the Bunker Tanker effecting delivery, or in case of delivery ex-wharf, of the shore-meter or like equipment.

5.2.  The Marine Fuel to be delivered shall be one of Seller's commercial grades of Marine Fuel as currently offered generally at the time and Point of Delivery. **NO WARRANTIES, EXPRESS OR IMPLIED, AS TO QUALITY OR FITNESS FOR ANY PURPOSE ARE GIVEN OR FORM PART OF THE CONTRACT**. Buyer acknowledges and warrants that it is Buyer's responsibility to test the Marine Fuel delivered and to ensure that it is proper in all respects prior to use of such Marine Fuel on the Vessel.

5.3.  Responsibility for establishing compatibility of the Marine Fuel delivered with any other marine fuel and for segregating or co-mingling the same rests solely with Buyer, it being understood however that incompatibility of the Marine Fuel with existing marine fuel on the Vessel is not a ground for rejection of the Marine Fuel by Buyer.

5.4.  For any claims related to quantity, the measurements provided by the Bunker Tanker shall be final, controlling, and binding.

## 6.  SAMPLING

6.1.  Buyer or its representative may witness the sampling of the Marine Fuel. During bunkering, a primary sample shall be drawn at a point determined by Seller closest to the Vessel's bunker manifold and otherwise in accordance with the procedures set out in IMO Resolution MEPC.182(59) Guidelines for the Sampling of Fuel Oil for Determination of Compliance with MARPOL 73/78 Annex VI or any subsequent amendments thereto. Each sample shall be thoroughly mixed and carefully divided into a minimum of four (4) identical samples and Buyer shall retain at least one sample of each grade of the Marine Fuel on board the Vessel for MARPOL purposes. The absence of Buyer or its representative shall not prejudice the validity of the samples taken. Mandatory local bunkering rules and regulations shall take precedence over the immediately previous provisions.

6.2.  The samples referred to in Clause 6.1 shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, Marine Fuel name, delivery date, and place and point of sampling and seal number, authenticated with the Vessel's stamp and signed by Seller's representative and the Master of the Vessel or the Master's authorized representative.

6.3.  Two (2) samples may be retained by Seller. Buyer shall maintain the other two (2) samples on board the Vessel (one of which shall be for MARPOL purposes).

6.4.  If the quantity is delivered by more than one Bunker Tanker, the sampling procedure shall be repeated as outlined in this Clause 6 for each Bunker Tanker's delivery.

## 7.  DELIVERY

7.1.   Delivery of the Marine Fuel shall be made subject to the customs of the Point of Delivery. Seller only guarantees to effect deliveries on a first come, first served basis, in accordance with Seller's supply schedule and in coordination with the Vessel's agent and/or representative.

7.2.   If Seller at any time or for any reason believes that there may be a shortage of Marine Fuel at the Place of Supply, Seller in its absolute sole discretion may allocate among Buyer and others its available and anticipated supply of Marine Fuel in such a manner as Seller solely determines. In such allocation, Buyer shall accept the allocated Marine Fuel and the Confirmation shall be amended accordingly.

7.3.   Seller shall not be required to deliver Marine Fuel into any of the Vessel's tanks or other places that are not regularly used for storage of bunkers or lubricants or other marine fuel as the case may be and shall not be required to deliver any Marine Fuel the export of which requires a government permit which permit has not been obtained.

7.4.   Delivery may be accomplished in one or more consignments at the Point of Delivery by such means as Seller solely may deem appropriate.

7.5.   Buyer shall, at the time the order is placed, designate a date or range of dates for delivery of the Marine Fuel, which dates will be confirmed in the Confirmation.

    7.5.1.   In the event the Vessel arrives earlier than 24 hours prior to the agreed date or range of dates or later than 24 hours after the agreed date or range of dates, Seller reserves the right to adjust the price to reflect any increase in the relevant Platts publications, which may be obtained from Seller upon request.

    7.5.2.   Should Buyer elect to cancel the order after Seller has issued the Confirmation, Buyer shall pay a cancellation fee equal to 5% of the order price. Clause 7.5.2 does not apply where Buyer cancels subject to the provisions of Clause 9.1.

    7.5.3.   Seller shall endeavor to deliver the Marine Fuel as soon as reasonably practicable within the date or range of dates designated by Buyer, with due regard for congestion and prior delivery commitments.

    7.5.4.   Buyer shall not be entitled to any claim for demurrage or other compensation for delay unless expressly agreed and confirmed in writing by Seller before the Delivery.

    7.5.5.   Seller shall have no liability for the inability to deliver on public or dock holidays or on customary non-business days of the week.

    7.5.6.   Seller shall have no liability for delays resulting from the Vessel's inability, for any reason whatsoever, to accept delivery of the Marine Fuel at the time and date agreed between the Parties.

7.6.   Buyer shall give Seller 72 hours and 48 hours approximate notice, and 24 hours definite notice, of the Vessel's arrival and the location and time at which delivery is required. Buyer shall immediately advise of any changes in excess of three (3) hours.

7.7.   Buyer shall notify Seller about the progress of the Vessel while transiting the Panama Canal, and will advise of any changes, delays, or problems that the Vessel encounters during the passage and transit.

7.8.   Buyer shall, at its own expense, provide a clear and safe berth for the Bunker Tanker alongside the Vessel and shall provide all necessary equipment, facilities, personnel, and assistance required to effect provision of the Marine Fuel to the Vessel. Buyer shall make all connections and disconnections between the pipelines or delivery hoses and the Vessel's intake line and shall render all other necessary assistance and provide sufficient tankage and equipment to receive promptly each and every consignment of the Marine Fuel. Buyer is responsible for ensuring that the Marine Fuel is delivered at a safe rate and pressure and that all equipment utilized therefore is in a safe and satisfactory condition. Buyer agrees to pay and indemnify Seller against all claims and expenses in respect to any actual or alleged loss, damage, or delay caused by the Vessel to any Bunker Tanker.

7.9.   Charges for such Bunker Tanker are for Buyer's account and included in the Price. Buyer will pay as part of the Price for the provision by Bunker Tanker in accordance with the rates and charges of the Bunker Tanker operator, owner, or manager. Buyer understands that provisions of different types or grades of Marine Fuel may necessitate the use of two or more Bunker Tankers and will be subject to separate charges.

7.10.  Seller shall have no responsibility for detention or demurrage incurred by Buyer or the Vessel caused by delays in the Bunker Tanker arriving on station due to bad weather or bad visibility. Bad weather and bad visibility may be determined based on local weather reports and in any event such determination is within the Bunker Tanker's sole discretion.

7.11.  In any case due to any delays or detention of the Vessel, Seller may exercise its right to cancel the Delivery without releasing Buyer from liability for all and any costs that may arise as a result of such delay.

7.12.  Buyer shall ensure that the Vessel is in possession of all permits and/or certificates required to comply with all relevant regulations pertaining to delivery of the Marine Fuel at the Point of Delivery

7.13.  The Master of the Vessel shall:

   7.13.1.  advise Seller in writing, prior to delivery, of the maximum allowable pumping rate and pressure and agree on communication and emergency shut-down procedures;

   7.13.2.  notify Seller in writing, prior to delivery, of any special conditions, difficulties, peculiarities, deficiencies or defects in respect of and particular to the Vessel which might adversely affect the delivery of the Marine Fuel; and,

   7.13.3.  provide a free side to receive the Marine Fuel and render all necessary assistance which may reasonably be required to moor or unmoor the Bunker Tanker, as applicable.

## 8.   DOCUMENTATION

8.1.   Before commencement of delivery, Seller shall, without obligation, endeavor to present a bunker requisition form or similar document, duly signed by Seller, which shall contain the quantities to be delivered and all information required, in accordance with the Confirmation or any subsequent amendments thereof, including, in particular, the values for: viscosity; density; sulfur content; and flash point. In addition, and if available, similar information may be provided for vanadium, ash content, water content, and pour point.

8.2.    Once the delivery is completed and quantities measured, a BDN shall be signed and stamped by the Master of the Vessel and returned to Seller or its representative, as acknowledgement of the actual volume only, and a duplicate copy shall be retained by the Master of the Vessel. The BDN may contain the following information: delivered quantity in volume units; delivered quantity in weight units; density in kg/m3 at 15o C as per ISO 3675; flash point; sulfur content in % m/m as per ISO 8754; and viscosity. The BDN as issued may not be amended or written or remarked on. Any attempt to do so is invalid and of no effect and may result in the re-issuance of a clean BDN.

8.3.    In the event the Master of the Vessel is not satisfied with the sampling, quality, quantity, or any other matter concerning the Marine Fuel or its delivery, the Master shall, upon completion of delivery, issue Notice by a separate letter of protest, receipt of which must be acknowledge in writing by Seller or its representative. Claims for sampling, quantity or any other matter concerning the Marine Fuel or its delivery are barred should the Master failed to provide the Notice as set out in this Clause 8.3.

8.4.    Buyer warrants that it is authorized by the Vessel's owners, operators, and/or managers to order the Marine Fuel delivered to the Vessel and that it has provided a copy of these terms and conditions to the Vessel's owners, operators, and/or managers.

8.5.    Buyer further warrants that by receiving the Marine Fuel and signing the BDN, the Master acknowledges that the Vessel is bound by these terms and conditions.

## 9.    PRICE

9.1.    The Price as stated in the Confirmation shall not be subject to variation except as may be provided in this Contract. Buyer recognizes that the cost of Marine Fuel is volatile and Seller therefore reserves the right to increase the Price at any time before Delivery. On receipt of Seller's Notice to Buyer of such increase in Price, Buyer may forthwith give Notice to Seller of cancellation of the Contract without penalty. If no such Notice is received within one hour of Seller advising Buyer of the increase of the Price, Buyer shall be deemed to have agreed to the revised Price and the Contract so revised shall remain in full force and effect and any cancellation thereafter shall also continue to be subject to this Contract.

9.2.    The Price shall be in the amount expressed per unit and in the currency stated in the Confirmation for each grade of Marine Fuel delivered to the Vessel. In the event the Price is quoted in volume units, conversion to standard volume shall be at sixty (60) degrees Fahrenheit or at fifteen (15) degrees Celsius.

9.3.    Any and all additional charges, if applicable, shall be specified in Seller's quotation and in the Confirmation and shall include but not be limited to:

9.3.1.    wharfage charges, barging charges, or other similar charges;

9.3.2.    mooring charges or port dues incurred by Seller which are for Buyer's account; and,

9.3.3.    duties, taxes, charges or other costs in the country where delivery takes place, for which Seller is accountable but which are for Buyer's account.

9.4.   Buyer shall, at Seller's request, execute and deliver to Seller such certificates or other documents as Seller may reasonably require in order to enable Seller to secure any tax exemption which may be available in connection with sales or deliveries hereunder. Seller confirms that it is a registrant for federal Goods and Services Tax or Harmonized Sales Tax and that its registration number will be specified on invoices sent to Buyer.

9.5.   Buyer should attend the Delivery and obtain at that time all outstanding information relating to the Delivery, including the exact quantities and precise specification of the Marine Fuel delivered. Seller shall be under no obligation at any time to produce to Buyer any evidence of the Delivery. It is expressly agreed that Seller's provision to Buyer of proof of delivery including of any BDN is not a prerequisite to payment of the Price.

## 10.   PAYMENT

10.1.   Buyer shall, except at Seller's option, pay Seller cash before delivery for the Marine Fuel. Such payment shall be a condition precedent to Seller's provision of the Marine Fuel.

10.2.   Payment of the Price will be made in United States dollars to the bank and account specified by Seller in full without deduction for any reason whatsoever, including withholding or deferment on account of any claim, counterclaim, or set-off, so as to ensure that Seller receives full value for the payment in cleared funds.

10.3.   Buyer may be approved by Seller's commercial credit department to make purchases of Marine Fuel against Seller's credit. Such approval will be conditioned on an amount of credit and specific terms as set out in correspondence by Seller (the "Credit Terms").

   10.3.1. If Buyer fails to make any payment while under the Credit Terms, such failure shall, at Seller's option, be deemed a breach of this entire Contract. In addition to such other remedies as it may have, Seller shall thereafter have the right to demand advance cash payment, to withhold deliveries until such advance payment is received (including payment of all amounts then outstanding), or to terminate this Agreement.

   10.3.2. If credit is extended to Buyer by Seller, Buyer shall furnish Seller with such information regarding Buyer's financial condition as Seller may reasonably request from time to time.

10.4.   Seller's acceptance of any payment after the Due Date shall not waive any of Seller's rights hereunder.

10.5.   Seller's exercise of any remedies provided in this Contract, including but not limited to withholding deliveries or terminating this Contract, shall not affect any obligation of Buyer hereunder.

10.6.   Except to the extent the Confirmation specifies other payment terms, each of the following terms shall apply:

   10.6.1.   Due Date is as provided in the Confirmation or, in default, the date of Delivery.

   10.6.2.   Timely payment is of the essence of the Contract.

   10.6.3.   Late payment will incur a financial charge to Buyer of 2.0% per calendar month on the outstanding sum calculated on a daily basis from the Due Date until receipt by Seller. Accrued financial charges will be added to and become part of the

outstanding sum at monthly intervals. In the event that the financial charge specified in the Contract is in excess of that permitted by relevant law, there shall be substituted the maximum amount so permitted.

10.6.4. Payment will be made by way of telegraphic, telex, swift or rapid electronic transfer to the bank and account specified by Seller. All bank and other charges, if any, incurred in effecting remittance will be for the account of Buyer. Buyer will give Seller immediate Notice, including identifying references, of payment of the Price.

10.7. Payment for the Marine Fuel shall be made as set forth in the Confirmation. In the event payment has been made in advance of delivery, same shall be adjusted on the basis of the actual quantities of Marine Fuel delivered and additional payment and/or refund shall be made within thirty (30) days after the completion of delivery.

10.8. Should Buyer appear to be in financial difficulty or unable to meet its obligations to other creditors as they become due, Seller on written Notice to Buyer may accelerate the payment date hereunder in which case payment is immediately due. In consideration of this acceleration, Buyer is entitled to a credit against the principal amount due of 2% per month (prorated over 30 days) for every day the payment is early.

10.9. Payment shall be deemed to have been made on the date the payment is credited to the counter of the bank designated by Seller. If payment falls on a non-Banking Day, then payment shall be made on or before the last Banking Day before the due date.

10.10. Seller may apply payments received from or on behalf of Buyer, notwithstanding any specific request to the contrary, to obligations of Buyer at the sole discretion of Seller in any order, including but not limited to the following in diminution or extinction of:

10.10.1. Accrued financial and other charges in respect of transactions for which the principal sum has been previously paid;

10.10.2. Accrued financial and other charges arising from all other transactions;

10.10.3. Any principal sum or sums due and outstanding commencing with the oldest and proceeding chronologically thereafter to the most recent;

10.10.4. Any principal sum which Seller knows or reasonably expects will fall due at a future date;

10.10.5. Any amount which is not subject to a maritime lien or other form of security available to Seller.

10.11. Any attempt by Buyer to assign payments to certain invoices or amounts shall be null and void.

10.12. Seller may in good faith vary, amend, withdraw, substitute, or add to the terms relating to payment of the Price at any time in the course of a transaction in such a manner as it shall in its absolute discretion consider necessary to protect its interests.

10.13. Buyer shall be responsible to confirm directly with Seller, by telephonic or other reliable means, the instructions including wiring or other payment details, for receipt by Seller of the Price and other amounts due to Seller. It shall be Buyer's sole responsibility to assure that Seller receives and confirms receipt of each payment from Buyer to Seller. Seller shall

not be responsible for diversion from Seller of any such payment, whether because of communications which appear to originate from Seller or for any reason otherwise. If Buyer makes payment which it believes is to Seller, but Seller does not receive that payment, Buyer shall remain responsible for making timely payment received by Seller.

10.14. In the event of non-payment, Seller reserves the right to pursue all legal remedies available to recover all amounts owed. Seller shall have a maritime lien on the Vessel identified by its IMO number until payment and interest has been received by Seller. "No-Lien Stamps" or remarks in any form or wording on the BDN shall be invalid and of no effect, and shall in no way impair Seller's lien or discharge the Vessel's responsibility for debts under this Contract.

10.15. Seller may at any time, with or without cause and without prejudice to all other rights and remedies which they may have, withdraw or suspended credit facilities from Seller to Buyer and all sums outstanding shall thereupon shall be due for Buyer's immediate payment to Seller.

10.16. In the event that Buyer or any subsidiary or parent thereof shall be insolvent, commit an act of bankruptcy, or otherwise shall be the subject of proceedings, judicial or otherwise, commenced for debt, bankruptcy, insolvency, liquidation, or winding up, or in the event that Seller has reasonable grounds for insecurity such as, without limitation, Buyer (in Seller's sole judgment) is likely to be unable to make timely payment to Seller, Seller may immediately and without Notice terminate the Contract and demand that Buyer immediately pay all amounts due under the Contract. Buyer agrees that Seller possesses priority over all other claims against Buyer.

## 11. CLAIMS

11.1. **Notice of any claim or potential claim must be given to Seller within the time limits specified in this Clause 11.** It is Buyer's sole responsibility to ensure that Notice is received by Seller, whose confirmation of receipt is required. Regardless of whether a claim or dispute has arisen or is anticipated, Buyer must always give prompt Notice to Seller of any discrepancy, error, or omission present in any form or document tendered, submitted, or produced by the Physical Supplier and of any unusual occurrence relating to the Delivery.

11.2. **Unless otherwise stated in the Confirmation, the time limit for receipt by Seller of Notice of a quantity dispute is one (1) hour following the Master's signature of the BDN.**

11.3. **Unless otherwise stated in the Confirmation, the time limit for receipt by Seller of Notice of a quality dispute is fifteen (15) days from the date of Delivery.**

11.4. **Notice of all other claims, specifically excluding any and all claims relating to or associated with quantity or quality which are subject to the time limits of this Contract, must be given to Seller as soon as reasonably possible and in any event no later than twenty-eight (28) days from the date of Delivery, or such shorter period as is specified in the Confirmation.**

11.5. To enable Seller to investigate and pursue a claim, the Notice must give sufficient information for Seller to be able to identify the relevant transactions, the nature of the

complaint, and the loss or damage alleged. Any Notice which does not give such sufficient information will not be valid. Buyer must provide a full and complete response to any and all questions, enquiries, and requests made of it by Seller concerning the claim and matters relating thereto.

11.6.   For bulk deliveries, delivery barges, wagons, and vehicles must be checked by Buyer by tank dipping to measure the contents and ensure full turnout. Flow meters must be checked by Buyer for seals, correct settings and calibration, and general condition. All of these checks must be carried out by Buyer before and after delivery of each consignment and each barge, wagon, or vehicle tank load. The Delivery must be supervised by Buyer at all times and care must be taken in ensuring that all documentation is complete and accurate before signing and stamping. Any discrepancies must be recorded on the BDN. Buyer understands that unless these procedures are followed, it is nearly always impossible for a claim to be substantiated. Buyer understands that where these receiving procedures are not followed, claims will not be allowed.

11.7.   Seller will not accept a claim for short delivery based upon figures obtained by measuring the Marine Fuel in the Vessel's tanks.

11.8.   Buyer is solely responsible to ensure that the quality of the Marine Fuel tendered for Delivery is that which is required by the Vessel and that the Marine Fuel is delivered into the correct tanks.

11.9.   Buyer is solely responsible for confirming that all documentation is in order and for noting any discrepancies on the BDN before signing and stamping.

11.10.  If Buyer has grounds to believe that the Marine Fuel supplied does not accord with the relevant description in the Confirmation or is defective, Buyer shall immediately:

11.10.1.  Take all steps to mitigate the consequences of having been supplied with the Marine Fuel.

11.10.2.  Give Seller Notice with full details of the Marine Fuel, together with the Vessel's position, destination, and ETA; the quantities and locations of all bunkers on board the Vessel; the rate and quantity of consumption since delivery and the location immediately prior to consumption of bunkers consumed; and for each of the three preceding deliveries to the Vessel, the place and date of supply, the name of any supplier, and the quantity, quality, and specification of marine fuel or material similar to the Marine Fuel supplied.

11.10.3.  Inform Seller of the whereabouts of Buyer's set of samples of Marine Fuel.

11.10.4.  If Buyer lodges a claim within the time limits set forth in this Contract, Seller may proceed to have the Physical Supplier's samples analyzed by a reputable independent testing laboratory. The results of such analysis shall at Seller's sole discretion be binding. Seller may also decide that Buyer's set of samples of the Marine Fuel be analyzed by a reputable independent testing laboratory. The results of such analysis shall also at Seller's sole discretion be binding Parties hereto. In no event, however, shall Buyer's tests of samples of the Marine Fuel be binding.

11.10.5. If it is alleged that any equipment or machinery has been damaged by defective Marine Fuel, Notice with full details must be given to Seller at the earliest opportunity and the item to which there is alleged damage must be preserved and made available for inspection on demand by Seller or its representative. The foregoing shall not be considered an undertaking of any liability by Seller or a waiver of Seller's rights hereunder.

11.11. **Within thirty (30) days of providing Notice of a claim, Buyer shall provide Seller with all documentation supporting Buyer's claim**, including, but not limited to, all analyses performed on the Marine Fuel. Buyer shall immediately give Seller opportunity to inspect the Vessel, including, without limitation, its engines, fuel tanks, equipment, logs, records, and copies of communications, including communications between the Vessel and Buyer (and/or between the Vessel and its owner, operator, or manager), as well as communications to and from fuel testing organizations consulted by Buyer or Vessel interests.

11.12. If Notice of any claim is not provided within the respective time periods this Contract specifies, or the conditions of this Contract for making any claim are not met, Buyer shall be time-barred from making a claim. It is further agreed that **any such claims are time-barred if Buyer does not commence litigation concerning the claim within one (1) year of the Delivery date.** Such litigation may only be brought, exclusively, in the United States District Court for the Southern District of New York. A further prerequisite of bringing any such litigation is Seller's full receipt of the Price and all other amounts billed by Seller to Buyer through this Contract.

11.13. A claim of any nature by Buyer does not relieve Buyer of the responsibility and obligation to make full and timely payment to Seller of the Price and of all other amounts billed by Seller.

## 12. RISK / TITLE

12.1. Seller's responsibility for the Marine Fuel shall cease and Buyer shall assume all risks and liabilities relating thereto, including loss, damage, deterioration, depreciation, contamination, evaporation, or shrinkage of the Marine Fuel and responsibility for loss, damage and harm caused by pollution or in any other manner to third parties when the Marine Fuel passes the flange connecting Seller's or Physical Supplier's delivery facilities, including any Bunker Tanker, with the receiving facilities of Buyer including but not limited to the Vessel, whether the Marine Fuel is provided ex-wharf or by Bunker Tanker.

12.2. Title to the Marine Fuel shall only pass to Buyer upon irrevocable payment for the value of the Marine Fuel delivered, pursuant to the terms of the Contract. Until such time as payment is made, on behalf of itself and the Vessel, Buyer agrees that it is in possession of the Marine Fuel solely as bailee for Seller. If, prior to payment, the Marine Fuel is commingled on board the Vessel with other material like the Marine Fuel, title to such material shall remain with Seller corresponding to the quantity of the Marine Fuel delivered. The above is without prejudice to such other rights as Seller has under this Contract and the laws of the governing jurisdiction in any action by Seller against Buyer and/or the Vessel in the event of non-payment. The laws of the United Kingdom specifically as applied in THE "SPAN TERZA", [1984] 1 Lloyd's Rep. 119 shall apply to and control the application and enforcement of this Clause.

12.3.   Buyer agrees that it shall disclose to any Ultimate Purchaser and to any and every Intermediate Buyer of the Marine Fuel that Seller continues to hold title to the Marine Fuel until Seller receives the Price and all other amounts which Seller bills to Buyer.

12.4.   Regardless of whether Buyer has made the disclosure required under Clause 12.3, Seller shall continue to hold title to the Marine Fuel as set out in the Contract.

## 13.   LIMITATION OF LIABILITY

13.1.   Notwithstanding any provision in this Contract or in the Confirmation to the contrary, Seller shall not be liable to Buyer for any loss or damage, including loss of profit or any other consequential damages or loss whatsoever, arising from any cause whatsoever whether in contract, tort, or otherwise, including due to the negligence of Seller, its servants, agents, or sub-contractors, beyond the difference in the value of the Marine Fuel and the Marine Fuel actually supplied, **but in no event to exceed the amount of $50,000.** Consequential damages or loss includes lost profits and any and all damage claims involving any delay in delivery, failure to make delivery, supply chain interruptions, and contracts and/or prospective contracts, detention, demurrage, charter hire, crew wages, towage, pilotage, lost profits, barge delivery charges and increased costs or expenses in obtaining replacement fuel.

13.2.   Buyer acknowledges and warrants that it is Buyer's responsibility to test the Marine Fuel and to ensure that it is proper in all respects prior to use of such Marine Fuel on the Vessel. Accordingly, Seller shall not be responsible for any damage to the Vessel, including without limitation, its machinery, tanks, or their contents, caused by Delivery of improper, defective, wrong, or otherwise unsuitable Marine Fuel.

13.3.   **DISCLAIMER OF WARRANTIES. THE MARINE FUEL IS SOLD AS IS WHERE IS AND ANY IMPLIED WARANTIES WHATSOEVER, WHETHER STATUTORY OR OTHERWISE, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE OR OF CONDITION, AND ANY ORAL OR IMPLIED AGREEMENTS, ARE EXPRESSLY EXCLUDED AND DISCLAIMED.**

13.4.   Seller shall not be liable to Buyer for any loss of profit, loss of use, or loss of Marine Fuel whatsoever, whether arising directly or indirectly from the performance or non-performance of this Contract, and whether or not the same is due to negligence or any other fault of Seller, its servants, or agents.

13.5.   Notwithstanding the foregoing, in the event that Seller is found to be liable to Buyer, the total amount payable by way of compensation shall not exceed the Price charged to Buyer for the Marine Fuel supplied under this Contract. It is a pre-condition to the payment of any compensation by Seller that the Price and all other sums billed by Seller to Buyer are first received by Seller.

## 14.   INSURANCE

Buyer is responsible for effecting and maintaining insurance which will fully protect Buyer, Seller, and all third parties connected in any way to this Contract and/or the Delivery from liability and damages arising from or in relation to all risks, hazards, and perils related to or arising from this Contract and provision of Marine Fuel.

## 15. LICENSES / PERMITS / APPROVALS

Buyer shall obtain all necessary permits, licenses, and approvals required to enable all parties involved in any way with the Delivery to execute all of their obligations under the Contract.

## 16. GOOD PRACTICE

Buyer shall, in addition to observing and complying with the terms of the Contract, abide by generally accepted good operating practices and procedures all in compliance with local rules and regulations.

## 17. COMPLIANCE WITH LAWS AND REGULATIONS

17.1. Buyer will not do or permit to be done anything which might cause any breach or infringement of the laws and regulations of the Flag State, or of the places where the Vessel trades or takes Marine Fuel.

17.2. Except as otherwise expressly provided herein, Buyer (including each of its directors, employees, or agents) shall not, without express written permission of Seller:

17.2.1. give to or receive from Seller (including Seller's directors, employees, or agents) any commission, fee, rebate, gift or entertainment of significant cost or value in connection with this Contract;

17.2.2. enter into any business arrangement with any director, employee, or agent of Seller not acting as a representative of Seller;

17.2.3. pay, directly or indirectly, any funds or anything of value to any public official or official of a national or international organization for the purpose of influencing such person's acts or decisions in violation of the applicable laws of the United States of America, the European Union or the laws of the jurisdiction in which the delivery of the Marine Fuel was made.

## 18. SANCTIONS COMPLIANCE

18.1. The following provisions shall apply where any sanction, prohibition, or restriction is imposed on any specified persons, entities, or bodies including the designation of any specified vessels or fleets under United Nations resolutions or trade or economic sanctions, laws, or regulations of the European Union or the United States of America.

18.2. Buyer warrants that at the date of entering into this Contract and continuing until delivery of the Marine Fuel and payment by Buyer to Seller in full of all amounts billed that:

18.2.1. Buyer is not subject to any of the sanctions, prohibitions, restrictions, or designation which prohibit or render unlawful any performance under this Contract;

18.2.2. Buyer is purchasing the Marine Fuel as principal and not as agent, trustee, or nominee of any person with whom transactions are prohibited or restricted; and,

18.2.3. The Vessel is not a designated vessel and is not and will not be chartered to any entity or transport any cargo contrary to the restrictions or prohibitions in this Clause 18.

18.3. Seller shall not be required to do anything which constitutes a violation of the laws and regulations of any jurisdiction to which Seller is subject.

18.4. Buyer shall indemnify Seller against any and all claims, including seizure or return of any payment, losses, damage, costs, and fines whatsoever, suffered by Seller resulting from any breach of warranty as aforesaid and in accordance with this Contract.

18.5. Buyer confirms that Buyer abides by international trade sanctions regulations. Seller expressly reserves the right without liability to terminate the Contract and/or not to deliver to vessels or persons which are subject to or are carrying flags of any country subject to international trade sanctions.

## 19. TERMINATION

Without prejudice to any accrued rights hereunder, Seller shall be entitled to terminate this Contract in the event of:

19.1. Any application being made, any proceedings being commenced, or any order or judgment being given by any court for

19.1.1. The liquidation, winding up, bankruptcy, insolvency, dissolution, administration, or reorganization or similar; or

19.1.2. The appointment of a receiver, liquidator, trustee, administrator, administrative receiver, or similar functionary of Buyer of all or a substantial part of its assets (otherwise than for the purpose of a reconstruction or amalgamation);

19.2. Buyer or any of its affiliates failing to pay its debts as they become due or suspending payment of its financial obligations, ceasing to carry on business, or compounding or making any special arrangement with its creditors; or,

19.3. Any act being done or event occurring which, under the applicable law thereof, has a substantially similar effect to any of the said acts or events described above.

## 20. INDEMNITY

Without prejudice to any other claims arising hereunder or in connection herewith, if loss is suffered or a claim or liability is incurred by or against Seller as a direct result of acts or omissions of Buyer, Buyer will defend and indemnify Seller in respect of such loss or liability. Seller shall have the right to direct the defense provided as well as to settle any loss, claim or liability. Buyer shall provide this indemnity regardless of whether the loss, claim, or liability is, or is claimed to be, the result of Seller's own negligence.

## 21. FORCE MAJEURE

21.1. Seller shall not be liable for any failure to fulfill any term or condition of the Contract if fulfillment has been delayed, hindered, or prevented by any circumstances whatsoever which are not within the immediate control of Seller, including, , without limitation, the generality any of the foregoing: act of God; act of third party; fault or failure of vessel, master, or crew; act or omission of Buyer; strike, lockout, or labor dispute or reasonable apprehension thereof; government order, request, or restriction; and/or limitation, restriction, or interruption to existing or contemplated sources of supply of Marine Fuel or the means of supply thereof, including but not limited to failure to deliver by the Physical Supplier.

21.2.   In the event that performance is prevented or delayed by Force Majeure, Seller may cease or reduce deliveries in any manner as it may determine in its sole discretion. Nothing in this Clause shall be deemed to excuse Buyer from the obligation to make payments for the Marine Fuel delivered.

## 22.   SAFETY AND THE ENVIRONMENT

22.1.   In the event of any spillage (which for the purpose of this Clause shall mean any leakage, escape, spillage, or overflow of the Marine Fuel) causing or likely to cause pollution occurring at any stage of the bunkering operation, Buyer shall (regardless as to whether Buyer is responsible) immediately take such actions as are reasonably necessary to effect clean up and which shall always be conducted in accordance with such local laws and regulations which may compulsorily apply.

22.2.   Where it is a compulsory requirement of the law of the Place of Supply and/or Point of Delivery of the Marine Fuel that Buyer shall have in place its own oil spill contingency plans, Buyer shall ensure that it has in place valid oil spill contingency plans.

22.3.   Buyer hereby guarantees payment of and/or agrees to indemnify, defend, and hold Seller harmless for any claims, losses, damages, expenses, penalties, or other liabilities incurred by Seller under any state, national, or international oil pollution legislation as a result of any spillage occurring while the Marine Fuel is being transported directly or indirectly to or from the Vessel. Buyer shall similarly indemnify, defend, and hold Seller harmless where any such spillage occurs once risk in the Marine Fuel has passed to Buyer. Seller in such events shall have the right to direct the defense and to settle any claims, losses, damages, expenses, penalties, or other liabilities. This Clause shall apply even if the claims, losses, damages, expenses, penalties, or other liabilities arise or are claimed to arise from Seller's sole negligence.

## 23.   DRUG AND ALCOHOL POLICY

23.1.   Buyer shall enforce a company drug and alcohol policy on board and adjacent to the Vessel and/or the Bunker Tanker.

23.2.   Buyer's drug and alcohol policy shall meet or exceed the standards in the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, as amended.

23.3.   Buyer's and the Vessel's personnel shall comply with Buyer's drug and alcohol policy while at Seller's facilities and on board or adjacent to the Vessel and/or the Bunker Tanker.

23.4.   Buyer acknowledges and agrees that in any relation to this Contract, the selling, possession, distribution, use or being under the influence of alcohol or any controlled substance or dangerous drugs other than those medically prescribed is prohibited.

## 24.   NO THIRD PARTY RIGHTS

Except as confirmed by a signed writing of Seller, no third parties may enforce any term of this Contract.

## 25.   ASSIGNMENT

25.1.   Buyer shall not and may not assign its interest in this Contract without Seller's prior written approval.

25.2. Seller may assign this Contract and/or its interest therein without notice to Buyer.

**26. SEVERABILITY**

If any term of this Contract is, becomes, or is held to be illegal, invalid, or unenforceable in any respect under any law or jurisdiction, such term shall be deemed amended to the extent necessary to avoid such illegality, invalidity, or unenforceability, or, if such amendment is not possible, such term shall be deemed deleted from this Contract to the extent of such illegality, invalidity, or unenforceability, and the remaining terms shall continue in full force and effect and shall not in any way be affected or impaired thereby.

**27. BREACH OF CONTRACT**

27.1. If Buyer cancels, terminates, or otherwise fails to take delivery, in whole or in part, of the Marine Fuel, Buyer shall be responsible for all costs resulting from such failure, including without limitation, lost profits and any costs and expenses incurred by Seller to downgrade the Marine Fuel or return unaccepted quantities of the Marine Fuel. In such instance, Seller shall not be responsible for any costs resulting from such failure, including without limitation, replacement costs and expenses incurred by Buyer. Clause 26.1 does not apply where Buyer cancels subject to the provisions of Clause 9.1.

27.2. Seller may treat any other breach by Buyer of any term of the Contract as a breach of a condition and it may, at its discretion, continue to perform under this Contract or treat the Contract as repudiated or terminated and seek such remedies as it considers appropriate. All terms of the Contract related to recovery of the Price and amounts due to Seller, the limit of liability of Seller and limitation on any claims, and Buyer's responsibility to defend, indemnify, and hold Seller harmless, as well as all other Contract terms that Seller may declare to continue in force, shall survive such termination and repudiation.

**28. LIENS / CHOICE OF LAW / JURISDICTION / VENUE**

28.1. In addition to any other security Seller may have (including retention of title to the Marine Fuel), where the Marine Fuel is provided to a vessel, , Buyer agrees that it enters this Contract pledging, and that Seller provides the Marine Fuel relying on, the credit of the Vessel. It is agreed and acknowledged that a maritime lien *in rem* against the Vessel is thereby created for the Price and all other amounts owed by Buyer to Seller for provision of the Marine Fuel to the Vessel. Seller may enforce and execute on such maritime lien *in rem*, and maritime claim, in any court having jurisdiction. Buyer represents that it is the Vessel's owner, or charterer, or a person authorized by the Vessel's owner or charterer, to have Seller (including the Physical Supplier) provide the Marine Fuel to the Vessel on the credit of the Vessel. If Buyer is not the owner of the Vessel, Buyer hereby expressly warrants that Buyer has the authority of the owner to pledge the Vessel's credit as aforesaid. Buyer warrants that such owner has been given notice of this Contract and this term of the Contract.

28.2. Any Notice by Buyer or any other entity that a maritime lien on the Vessel may not be created, including because of the existence of a prohibition of lien term in any applicable charter, must be given to Seller in the specific order for the Marine Fuel, and in any event before issuance of the Confirmation. Seller shall not be bound by any attempt by any person to restrict, limit, or prohibit its lien or liens attaching to the Vessel unless Notice of the

same is given to Seller in the initial order for the Marine Fuel and before Seller sends its Confirmation to Buyer.

28.3.   Where Notice is given pursuant to Clause 28.2,

    28.3.1.   no credit can be granted to Buyer;

    28.3.2.   Seller may demand that Buyer makes full payment of the Price and all amounts otherwise due Seller in cash or equivalent prior to Delivery; and/or,

    28.3.3.   Seller may terminate or rescind this Contract, including any obligation to provide Marine Fuel, without penalty.

28.4.   Any communication or attempted communication of a no lien provision that does not comply with Clause 28.2 shall be of no effect. No communication or attempted communication to any Physical Supplier of a no lien provision or restriction, by way of any BDN or otherwise, shall ever be effective.

28.5.   Except as expressly stated herein, this Contract is subject to and governed by United States maritime law (including the United States Commercial Instruments and Maritime Lien Act, 46 U.S.C. Sections 31301 *et seq.*). Buyer irrevocably submits to the exclusive jurisdiction and venue of the courts of the United States of America and waives any objections to such forum based upon *forum non conveniens* or venue. To the extent United States maritime law does not provide a rule of law, New York law applies. Notwithstanding the foregoing, Seller retains the right to enforce its maritime lien and attachment rights against the Vessel, and any other rights under this Contract, in any court or tribunal of any state or country in Seller's sole discretion. United States maritime law shall apply to any determination of the existence and priority of a maritime lien, regardless of the jurisdiction in which Seller takes action.

28.6.   Service or notice of process shall be complete on Buyer when made by Seller to Buyer by facsimile or other electronic means. Such service or consent to jurisdiction and venue shall not be construed to mean that Buyer has an agent present in or adjacent to the jurisdiction of enforcement within the meaning of United States maritime law, including Supplemental Rule B.

28.7.   If Buyer is or claims to be a foreign sovereign entity within the meaning of the United States Foreign Sovereign Immunities Act or similar law, Buyer expressly waives its rights under that Act or similar law, including any immunity or exemption from prejudgment attachment, *in rem* arrest or attachment of any vessel, or other prejudgment process.

28.8.   In the event of a conflict between admiralty and bankruptcy jurisdiction, it is agreed that admiralty jurisdiction pre-empts bankruptcy jurisdiction with respect to the rights and obligations under this Contract and with respect to enforcing maritime lien or attachment rights.

28.9.   Buyer shall, in connection with any action by Seller to recover from Buyer and/or the Vessel any amount of the Price or other amount owed to Seller, and/or any action by Seller to enforce this Contract, pay to Seller all of Seller's actual attorneys (including para-professional) fees, costs, and expenses.

28.10.  In consideration of Seller's extension of credit to Buyer, Buyer irrevocably assigns to Seller all right, title, and interest to all claims and security interests, including but not limited to maritime liens *in rem* (herein, the "Assigned Claims") which Buyer may have arising out of any transaction or provision involving any vessel receiving the Marine Fuel, including but not limited to any claim for a maritime lien *in rem* which the Buyer may have against such vessel, until Seller is fully paid the Price and all amounts due Seller.

28.11.  In further consideration of Seller's extension of credit to Buyer, Buyer agrees that for the sole purpose of providing the Marine Fuel to the Vessel, directly or indirectly, Buyer and each Intermediate Buyer serves as the limited agent of Seller for the purpose of providing the Marine Fuel to the Vessel and receiving an order for that Marine Fuel, and that this Contract shall extend to each Intermediate Buyer and Ultimate Purchaser. Each order for Marine Fuel from any Ultimate Purchaser to any Buyer (including any Intermediate Buyer) shall be considered an order for Marine Fuel from that Ultimate Purchaser to Seller, with Seller relying on the full credit of the Vessel to secure payment of the Price and all amounts owed to Seller, and Seller further receiving assignment of all rights that Buyer and any Intermediate Buyer otherwise may have for the Price.

28.12.  Seller shall hold exclusive title to and have the exclusive right to exercise and enforce its rights to such Assigned Claims until Seller is fully satisfied for all amounts which the Assigned Claims secure. Seller may proceed anywhere in the world, including in the name of Buyer, to assert and recover on its Assigned Claims, including but not limited to arrest of the Vessel and/or for recovery from Buyer and any debtor to Buyer.

28.13.  Buyer agrees in turn that it will require any further entity to which Buyer sells or purports to sell the Marine Fuel, to assign to Seller all of such further entity's Assigned Claims. Buyer further agrees that it will within one (1) day of Seller's request provide Seller with the identity, including telephone, email, and facsimile address, of each Intermediate Buyer and each Ultimate Purchaser.

28.14.  In the event that any Buyer (including any Intermediate Buyer and any purported assignee of the Buyer), receives any part of the Price from any entity before Seller is fully paid the Price and all other amounts Seller has billed in connection with this Contract, Buyer and its assignee agree that they receive that amount only as trustee, custodian, and fiduciary for and of Seller. In no event shall such amount of the Price be Buyer's (or any Intermediate Buyer's or Buyer's assignees') property but, in all events Buyer and any assignee shall hold such Price as custodian, trustees, and fiduciary and pay to Seller the Price as soon as received by any Buyer.

28.15.  Buyer grants Seller a limited power of attorney to execute on Buyer's behalf such documents, including filings under the Uniform Commercial Code of any United States state or similar government body under any law providing for registration of any security interest, any filing which Seller may consider helpful to perfect any security interest which Seller holds under this Contract.

28.16.  Upon Seller's receipt of full payment of the Price and all other amounts which Seller has billed to Buyer, Seller transfers and assigns to Buyer all maritime liens, other security, and *in personam* claims against the Ultimate Purchaser which Seller has related to the Marine Fuel. Until such time, neither Buyer nor its assignees has any right except as trustee,

fiduciary, and custodian for Seller, to claim or collect any amount related to the Marine Fuel and owed by any entity.

**29.    NOTICE**

29.1.   The giving of any Notice may be fulfilled by the use of facsimile transmission, or email with return receipt. The communication shall be deemed to have been given to and received by Seller only upon Seller's return written confirmation of receipt of such Notice.

29.2.   Should Buyer give Notice under this Contract, Buyer shall ensure that it is effectively given to and received by Seller during Seller's office hours. If such Notice is sent outside Seller's office hours it shall be treated as received during Seller's next working day.

**30.    ENTIRE AGREEMENT**

30.1.   This Contract states the entire agreement between Buyer and Seller in relation to the order, sale, and purchase of the Marine Fuel and supersedes all previous agreements whether oral or written between Buyer and Seller in relation thereto.

30.2.   Buyer acknowledges that in entering into this Contract, Buyer has not relied on and shall have no right or remedy in respect of any statement, representation, assurance, or warranty (whether or not made negligently) other than what this Contract expressly sets out.

30.3.   Any terms implied into this Contract by any law, opinion, or construction are hereby excluded. Nothing in this Contract shall limit or exclude any liability for fraud by Buyer.

30.4.   Each provision of marine fuel by Seller to Buyer shall constitute a separate Contract, except that, prior notice to Buyer of the terms of this Contract shall be considered notice of the terms of this Contract for current and subsequent applications of the terms of this Contract.

# EXHIBIT B



JAN 23, 2018

**QUOTATION**

To: Transportación Marítima Mexicana, S.A. de C.V. / Owners
Attn: Rafael Montiel

According to your inquiry please find as follows:

| Vessel Name | **CHEMBULK HOUSTON** |
|---|---|
| Port/Eta | **HOUSTON / 24 JAN, HOUSTON OR BOLIVAR ROADS** |
| Grade 1 / Qty | **FO-380 (ISO8217:2010 RMG380 – Max 3.5% Sulphur / 420 MTS** |
| Price 1 | **USD $360.00 MTW** |
| Grade 2 / Qty | **LSMGO (ISO8217:2010 DMA – Max 0.1% Sulphur / 100 MTS** |
| Price 2 | **USD $607.00 MTW** |
| Barging | **$8,855.00 + 24% FUEL SURCHARGE** |
| Extras | **WHARFAGE $0.00 / LUMPSUM, SECURITY FEE $0.00 / LUMPSUM, HARBOUR FEE $0.00 / LUMPSUM,** |
| Supplier | **NUSTAR** |
| Buyer | **Transportación Marítima Mexicana, S.A. de C.V. and/or Owners** |
| Credit Terms | **07 ddd against emailed COPIES of Invoice/BDR** |
| Agent | **MARSERVE** |

A copy of our Terms & Conditions of Sale Section "B" will be sent to you upon request.

Buyer acknowledges that a lien over the vessel is created for the value of the product(s) supplied and that the Seller is relying upon the faith and credit of the vessel.

Payment to be made no later than 07 days from date of delivery without counterclaim or setoff.

We thank you for the opportunity of completing this business.

Kind Regards,
Contico Trading Co. S.A.

## EXHIBIT B

# EXHIBIT C

| SHIP | INVOICE | PRINCIPAL | DELIVERY DATE | TERMS | DUE DATE | PAYMENT DATE | DAYS OVERDUE | RATE | INTEREST | PAYMENT | PRINCIPAL REMAINING DUE | DAYS OVERDUE | CLOSING DATE OF BALANCE | INTEREST ON PRINCIPAL UNPAID | PRINCIPAL UNPAID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Maya | 349 | $ 174,107.22 | 11/18/2017 | 7 | 11/25/2017 | 1/12/2018 | 48.00 | 2.00% | $ 5,571.43 | $ 174,107.22 | $ 5,571.43 | 153 | 6/14/2018 | $ 568.29 | $ 6,139.72 |
| Tula | 352 | $ 290,714.74 | 11/23/2017 | 7 | 11/30/2017 | 1/23/2018 | 54.00 | 2.00% | $ 10,465.73 | $ 290,714.74 | $ 10,465.73 | 142 | 6/14/2018 | $ 990.76 | $ 11,456.49 |
| Maya | 354 | $ 92,840.68 | 12/16/2017 | 7 | 12/23/2017 | 2/9/2018 | 48.00 | 2.00% | $ 2,970.90 | $ 92,840.68 | $ 2,970.90 | 125 | 6/14/2018 | $ 247.58 | $ 3,218.48 |
| Chembulk Houston | 357 | $ 28,662.21 | 12/25/2017 | 7 | 1/1/2018 | 2/14/2018 | 44.00 | 2.00% | $ 840.76 | $ 28,662.21 | $ 840.76 | 120 | 6/14/2018 | $ 67.26 | $ 908.02 |
| Chembulk Houston | 359 | $ 67,130.41 | 1/2/2018 | 7 | 1/9/2018 | 2/23/2018 | 45.00 | 2.00% | $ 2,013.91 | $ 67,130.41 | $ 2,013.91 | 111 | 6/14/2018 | $ 149.03 | $ 2,162.94 |
| Veracruz | 362 | $ 194,515.17 | 1/13/2018 | 7 | 1/20/2018 | 3/5/2018 | 44.00 | 2.00% | $ 5,705.78 | $ 194,515.17 | $ 5,705.78 | 101 | 6/14/2018 | $ 384.19 | $ 6,089.97 |
| Chembulk Houston | 363 | $ 223,104.46 | 1/27/2018 | 7 | 2/3/2018 | 3/9/2018 | 34.00 | 2.00% | $ 5,057.03 | $ 223,104.46 | $ 5,057.03 | 97 | 6/14/2018 | $ 327.02 | $ 5,384.06 |
| Olmeca | 365 | $ 193,986.70 | 1/17/2018 | 7 | 1/24/2018 | 3/20/2018 | 55.00 | 2.00% | $ 7,112.85 | $ 193,986.70 | $ 7,112.94 | 86 | 6/14/2018 | $ 407.81 | $ 7,520.75 |
| Tula | 366 | $ 58,292.79 | 1/11/2018 | 7 | 1/18/2018 | 3/23/2018 | 64.00 | 2.00% | $ 2,487.16 | $ 58,292.79 | $ 2,487.16 | 83 | 6/14/2018 | $ 137.62 | $ 2,624.78 |
| Chembulk Houston | 367 | $ 50,184.29 | 2/19/2018 | 7 | 2/26/2018 | 4/13/2018 | 46.00 | 2.00% | $ 1,538.98 | $ 50,184.29 | $ 1,538.90 | 62 | 6/14/2018 | $ 63.61 | $ 1,602.60 |
| Tula | 368 | $ 246,314.00 | 1/11/2018 | 7 | 1/18/2018 | 4/20/2018 | 92.00 | 2.00% | $ 15,107.26 | $ 246,314.00 | $ 15,107.26 | 55 | 6/14/2018 | $ 553.93 | $ 15,661.19 |
| Tula | 369 | $ 246,314.00 | 1/11/2018 | 7 | 1/18/2018 | 5/4/2018 | 106.00 | 2.00% | $ 17,406.19 | $ 246,314.00 | $ 17,406.19 | 41 | 6/14/2018 | $ 475.77 | $ 17,881.96 |
| Tula | 370 | $ 43,117.72 | 2/17/2018 | 7 | 2/24/2018 | 6/1/2018 | 97.00 | 2.00% | $ 2,788.28 | $ 43,117.72 | $ 2,788.28 | 13 | 6/14/2018 | $ 24.17 | $ 2,812.44 |
| Chembulk Houston | 371 | $ 54,837.25 | 3/11/2018 | 7 | 3/18/2018 | 6/4/2018 | 78.00 | 2.00% | $ 2,851.54 | $ 54,837.25 | $ 2,851.54 | 10 | 6/14/2018 | $ 19.01 | $ 2,870.55 |

$ 81,917.80          $ 81,917.89          $ 4,416.04   $ 86,333.93

TOTAL DUE:   $ 90,749.97

EXHIBIT C

## VERIFICATION

I am a Principal of the law firm Simms Showers LLP, counsel to Contico/Plaintiff.

The facts alleged in the foregoing complaint are true and correct to the best of my knowledge and information based upon the records of Plaintiff made available to me by Plaintiff. Authorized officers of Plaintiff are not readily available in this District to make verifications on Plaintiff's behalf. I am authorized to make this verification on Plaintiff's behalf.

I further certify that, pursuant to Supplemental Rule B, I caused a search to be made of electronic records and Directory Assistance for addresses and telephone numbers in this District of Delaware. There is no record of any general or resident agent authorized to accept service of process for TMM in this District.

Pursuant to 28 U.S.C. § 1746(1), I solemnly declare under penalty of perjury that the foregoing is true and correct.

Executed on June 14, 2018.

J. Stephen Simms